In re Samuel SAX, Debtor.

**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff,**

v.

**Samuel SAX, Defendant.**

In re James SWEENEY, Debtor.

**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff,**

v.

**James SWEENEY, Defendant.**

**Bankruptcy Nos. 84 B 7709, 84 B 11659. Adv. Nos. 84 A 1224, 85 A 1461.**

United States Bankruptcy Court, N.D. Illinois, E.D.

Oct. 20, 1989.

Stephen Novack, Mitchell L. Marinello, Novack and Macey, Chicago, Ill., for FDIC.

S. Ira Miller, Chicago, Ill., for Sweeney.

George Feiwell, Feiwell, Galper & Lasky, Ltd., Chicago, Ill., for Samuel Sax.

Thomas F. Sax, Arvey, Hodes, Costello & Burman, Chicago, Ill., for Samuel Sax.

### FINDINGS OF FACTS AND CONCLUSIONS OF LAW, AND ORDER

ROBERT E. GINSBERG, Bankruptcy Judge.

This matter comes before the Court on the debtor, Sweeney's motion to reconsider this court's denial of his earlier motion under Bankruptcy Rule 7041 and Federal Rule of Civil Procedure 41(b) seeking the entry of a judgment in his favor after the close of the Plaintiff's evidence. When that motion was denied, the defendant offered no further evidence. Accordingly, this court orally found for the plaintiff and ruled that the debt the defendant owes the plaintiff is nondischargeable in this Chapter 7 case under 11 U.S.C. § 523(a)(4). The following constitutes the court's findings of fact and conclusions of law with respect to both the motion to reconsider and the plaintiff's complaint seeking a finding of nondischargeability.[1]

### JURISDICTION AND PROCEDURE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of the United States District Court for the Northern District of Illinois dated July 10, 1984 referring bankruptcy cases and proceedings to this court. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) as a determination of the dischargeability of a particular debt.

### FINDINGS OF FACT

1. James Sweeney ("debtor" or "Sweeney") is a former director of the United of America Bank ("the Bank") and the former president, majority shareholder and a director of the now defunct Sweeney Coal & Energy Corporation ("Sweeney Coal"), an oil and gas drilling business headquartered in Chicago.

2. The debtor was also a 50% owner, former president, and director of the now defunct Admiralty Energy Corporation ("Admiralty"), another oil and gas drilling business, which shared offices and some employees, including accountants, with Sweeney Coal.

3. A group of investors, including the debtor and his co-defendant Samuel Sax

---

1. Plaintiff's evidence included the testimony of both defendants, several other witnesses and numerous documents. In that regard, the findings and conclusions made herein are intended to supplement the court's oral findings made in connection with both the Rule 41(b) motions of both defendants and the Plaintiff's oral motion for judgment. All such oral findings and conclusions are specifically readopted herein.

("Sax"), acquired a controlling interest in the Bank in May, 1980 through a substantial purchase of the Bank's stock.

4. Sweeney was a director of the Bank from approximately May, 1980 until November, 1983.

5. The Bank's written loan policy in effect in 1980 required that:

    a. overdrafts honored by the Bank be treated in the same manner as loans;

    b. any loans to any director or to entities controlled by any director be presented to and approved by the board of directors of the Bank prior to disbursement;

    c. loans to closely held corporations be personally guaranteed by the principals thereof.

6. Both Sweeney Coal and Admiralty opened demand accounts at the Bank shortly after the Bank was acquired by its new owners in 1980.

7. On December 5, 1980 Sweeney signed a check in the amount of $140,000 payable to R. Kevin Russell on Admiralty's account at the Bank. The check was intended to pay for a working interest in more oil and gas ventures.

8. The Bank paid the Russell check on December 8, 1980, even though there were insufficient funds in Admiralty's checking account to cover the Russell check. An overdraft of approximately $123,000 in the Admiralty account resulted.

9. Although the Bank had the right under applicable law to reverse its payment on the Russell check up until midnight of December 9, 1980 without any liability and thereby eliminate the overdraft, it did not do so. Instead, the Bank, by failing to act before the midnight deadline incurred an obligation to pay the overdraft. The result was the equivalent of a $123,000 loan to Admiralty.

10. Admiralty did not have a credit line or overdraft privileges at the Bank, and the Bank generally did not permit overdrafts.

11. The Admiralty overdraft, since it was the equivalent of a loan, violated the Bank's Loan Policy.

    a. The Admiralty overdraft was not treated in the same manner as a loan. The overdraft was never documented as a loan, no credit procedures were followed and no loan file was ever created. No service fees, interest, or other fees were charged.

    b. The overdraft was not approved by the board of directors.

12. On or about December 9, 1989, Sweeney Coal obtained a loan from the Bank. The Sweeney Coal loan violated the Bank's Loan Policy.

    a. The minutes of the Bank's directors' meeting held on November 24, 1980, immediately prior to the disbursement of the Sweeney Coal loan, contain no reference to the Sweeney Coal loan, although the minutes of that meeting do refer to other loans to insiders of the Bank. The minutes were signed by Sax as chairman of the Bank's board of directors,[2] and were prepared by his secretary.[3] The Sweeney Coal loan was not presented, discussed or approved at the November 24 directors' meeting. In fact, the Sweeney Coal loan was not reflected in the minutes of any meeting of the directors of the Bank until June, 1983.

    b. Sweeney Coal was a closely held corporation and Sweeney was its principal. The Bank never obtained a personal guaranty from Sweeney for the

---

**2.** After the group of investors, including Sax and Sweeney, acquired controlling interest in the Bank, Sax became chairman of the board and chief executive officer of the Bank. Sax was also a 50% owner of Admiralty, chaired its board of directors, was its president and was co-manager of Admiralty with Sweeney.

**3.** An addendum was later attached to the minutes of the November 24 directors' meeting purporting to recite that the Sweeney Coal loan was presented to the Board of the Bank at that meeting. The addendum was false. It was prepared nearly eight months after the November 24, 1980 directors' meeting and only after the FDIC criticized the Bank's lending activities. It contains an incorrect loan amount ($150,000) and an incorrect date of disbursement.

Sweeney Coal loan, although the Bank's policy required principals of closely held corporate borrowers to personally guarantee such loans.

13. On December 9, 1980, the Bank disbursed $140,000 to Sweeney Coal pursuant to the Sweeney Coal loan by the issuance of a memorandum crediting the sum of $140,000 to Sweeney Coal's checking account at the Bank. No promissory note was executed by Sweeney Coal in regard to this disbursement.

14. On December 11, 1980, Sweeney Coal transferred $130,000 of the Sweeney Coal loan proceeds to Admiralty by means of a check signed by Sweeney on behalf of Sweeney Coal. Admiralty deposited the check into its overdrawn account at the Bank to cover the overdraft.

15. Sweeney knew of the Admiralty overdraft and the Sweeney Coal loan at the time the transactions occurred. Even though he was aware that neither transaction had been approved by the Bank's Board of Directors, Sweeney never caused either transaction to be brought before the board for approval. The debtor was also aware that, pursuant to the Bank's loan policy, he was required to personally guarantee the Sweeney Coal loan, something he failed to do.

16. In April, 1984, Illinois banking officials determined that the Bank was insolvent, closed the Bank, and caused the FDIC to be appointed as the Bank's receiver.

17. Sweeney Coal filed a petition under Chapter 7 of the Bankruptcy Code in 1984. The Sweeney Coal Chapter 7 case was a "no asset" case in the sense that no distributions were made to any unsecured creditors in that Chapter 7 liquidation. The FDIC thus received no payments in the Sweeney Coal case on account of the $116,000 principal balance of the Sweeney Coal loan or any of the interest accrued from December 5, 1983 through February 6, 1989. The FDIC has no hope of recovering from Sweeney Coal any of the remaining obligation on the Sweeney Coal loan as Sweeney Coal is defunct.

18. Eventually both Sweeney and Sax wound up as debtors in their own individual Chapter 7 cases. The FDIC, as successor to the now failed Bank, filed timely adversary complaints against both Sweeney and Sax, seeking a judgment that the individuals were personally liable for the Sweeney Coal debt owed to the FDIC as successor to the Bank. The FDIC alleged that Sax and Sweeney violated their fiduciary and other duties as directors of the Bank by causing the Bank to enter into the Sweeney Coal loan and Admiralty overdraft transactions, by knowing that those transactions had not received the proper approval of the Bank's board of directors and by knowing that the Sweeney Coal loan and the Admiralty overdraft were made on favorable terms and in violation of the Bank's loan policy. The FDIC also sought a finding that the debts Sweeney and Sax owed to it were nondischargeable under 11 U.S.C. § 523(a)(4).[4] The two complaints were consolidated for trial. The plaintiff's evidence was completed in July, 1987. Resumption of the trial was delayed by Sax's health problems and settlement negotiations. A settlement was reached between the FDIC and Sax, who was dismissed as a party in this proceeding on March 3, 1989. Sweeney declined to proceed with the trial as the sole defendant and introduced no evidence in defense of the claim after the close of the plaintiff's evidence. Sweeney's attorney did participate in the trial during the presentation of the Plaintiff's case.

19. The FDIC, as successor to the Bank, has suffered damages of at least $116,000 in principal, plus interest accrued from December 5, 1983 as a result of the Sweeney Coal loan and Admiralty overdraft transaction. Interest under the note for the Sweeney Coal loan (calculated at a rate of prime plus 1%) from December 5, 1983 through February 6, 1989 is $63,-

---

**4.** The FDIC also claimed that Sax alone had wasted huge amounts of Bank assets on reimbursement of personal and family expenses for which the Bank was not liable. The FDIC sought to have the amount of those improper expenses determined against Sax (not Sweeney) and held to be nondischargeable.

559.67. The total amount of the FDIC's claim against Sweeney is $179,559.67 plus interest from February 6, 1989 to the date of the entry of this order.

20. Pursuant to the Court's instructions, the FDIC prepared and filed with the Court a judgment order, together with proposed findings of fact and conclusions of law. Although no objection was filed by Sweeney to the FDIC's proposed findings and conclusions, the Court deemed it best to make its own findings and conclusions. In the meantime, Sweeney sought reconsideration of the Court's denial of his Rule 41(b) motion based on caselaw developments.[5]

## CONCLUSIONS OF LAW

### A. SWEENEY IS PERSONALLY RESPONSIBLE FOR THE DEBT

■ 1. Directors occupy a fiduciary relationship to the corporation which requires them to act with fidelity and good faith. Henn & Alexander, Laws of Corporations, pp. 562–64 (3d ed. 1983). Though not responsible for errors of judgment, directors have the duty of caring for the property of the corporation and of managing its affairs honestly. "If this duty has been ... violated ... [a director] can, without the aid of a statute, be compelled to make restitution." *Precision Extrusions, Inc. v. Stewart,* 36 Ill.App.2d 30, 183 N.E.2d 547, 552 (2d Dist. 1962).

2. As a Bank director, Sweeney owed a fiduciary duty to the Bank. *Hoehn v. Crews,* 144 F.2d 665 (10th Cir.1944), *cert. denied,* 323 U.S. 773, 65 S.Ct. 135, 89 L.Ed. 618 (1944), *aff'd,* 324 U.S. 200, 65 S.Ct. 600, 89 L.Ed. 870 (1945); *Fleishhacker v. Blum,* 109 F.2d 543 (9th Cir.1940), *cert. denied,* 311 U.S. 665, 61 S.Ct. 23, 85 L.Ed. 427 (1940) (in discharging their fiduciary duty, bank agents held to highest standards of fidelity); Fletcher Cyc. Corp. § 838 (Perm. ed. 1986) ("[t]he law demands the fullest disclosure and fair dealing by a director ... in his relations with a bank."). Sweeney

breached his fiduciary duty by participating in obtaining the Sweeney Coal loan and the payment of the Admiralty overdraft; by permitting the Bank to pay the overdraft and make the Sweeney Coal loan knowing that both transactions were being done without the knowledge or consent of the Bank's directors and in violation of the Bank's loan policy for overdrafts, close corporate loans, and insider loans; by receiving some or all of the benefits from those transactions; by failing to take any action to cause the Bank to rescind or collect the Sweeney Coal loan; by failing to bring the Sweeney Coal loan and the Admiralty overdraft to the attention of the Bank's board of directors. *See, e.g., In re Illinois Valley Acceptance Corp.,* 531 F.Supp. 737 (C.D.Ill.1982), *aff'd mem.,* 696 F.2d 997 (7th Cir.1982). Consequently, Sweeney is personally responsible for the debt. *Id.; Precision Extrusions,* 183 N.E.2d at 552.

■ B. PURSUANT TO § 523(a)(4), SWEENEY'S DEBT IS NONDISCHARGEABLE: Sweeney's debt is nondischargeable under 11 U.S.C. § 523(a)(4) because the following elements have been established by clear and convincing evidence: 1) the existence of an express trust; 2) a debt incurred by fraud or defalcation; and 3) a debt incurred by a breach of the debtor's fiduciary duty; i.e. a debt incurred by the debtor in his capacity as a fiduciary. *Klingman v. Levinson,* 831 F.2d 1292, 1295 (7th Cir.1987).

■ 1. *An Express Trust Existed:* The question of whether a debtor is a fiduciary under § 523(a)(4) is a question of federal, not state law. *In re Black,* 787 F.2d 503, 506 (10th Cir.1986); *In re Johnson,* 691 F.2d 249, 251 (6th Cir.1982); *In re Wing,* 96 B.R. 369, 374 (Bankr.M.D.Fla. 1989). Traditionally, the term fiduciary means any relationship involving "confidence, trust and good faith." *Wing,* 96 B.R. at 374. However, such a definition is too broad for the purposes of § 523(a)(4). Section 523(a)(4) requires the existence of a technical or express trust, not a trust im-

---

**5.** In addition, the Court has recently been advised that Sweeney has died. The FDIC needs a judgment of nondischargeability in order to be able to assert a claim against Sweeney's probate estate. *See generally* Bankruptcy Rule 1016.

posed by law. *Ragsdale v. Haller*, 780 F.2d 794 (9th Cir.1986). Thus, the question is whether Sweeney's services as a director of the Bank gave rise to an express trust.

■ The elements of an express trust traditionally include "an explicit declaration of a trust, a clearly defined trust *res*, and an intent to create a trust relationship." *In re Janikowski*, 60 B.R. 784, 789 (Bankr. N.D.Ill.1986); *In re Thornton*, 544 F.2d 1005, 1006 (9th Cir.1976). It is clear that an express trust relationship existed between the debtor and the Bank. The debtor, as director of the Bank, was explicitly entrusted with control over the Bank's funds. By agreeing to become a director of the Bank, Sweeney agreed to use the trust *res*, the Bank's resources, solely for the advantage of the Bank and not for any personal gain. Thus the terms and nature of his relationship to the Bank were both express and clear. Both the Bank's shareholders, who elected him as a director, and Sweeney, in agreeing to be a director, intended that Sweeney function as a fiduciary. This conclusion accords with a long line of cases concluding that a bank director is a fiduciary for purposes of § 523(a)(4) and its statutory predecessor.[6]

■ *2. The Debt Was Incurred By Defalcation:* The Code does not define the term "defalcation". The cases have used the term in the context of 523(a)(4) to describe a wide variety of circumstances, including "failure to meet an obligation; misappropriation of ... money held in any fiduciary capacity; failure to properly account for such funds.", *In re Anderson*, 64 B.R. 331, 334 (Bankr.N.D.Ill.1986); *quoting In re Alvey*, 56 B.R. 170, 173 (Bankr.W.D. Ky.1985). In general, "defalcation" within the meaning of § 523(a)(4) arises whenever it is shown that the "underlying trust fund was used for a purpose other than that contemplated by the original trust." *In re Wright*, 87 B.R. 1011, 1018 (Bankr.D.S.D.

1988); *see also In re Gans*, 75 B.R. 474, 490 (Bankr.S.D.N.Y.1987).

■ Applying this definition of "defalcation" to the case at hand, it is evident that it was never the intent of the Bank that its funds be used by a director in a manner inconsistent with the Bank's loan policy. Moreover, it was never the intent of the Bank that its directors be given special loan privileges. Had Sweeney been an ordinary customer, the Bank would not have approved either the Sweeney Coal loan or the Admiralty overdraft. Sweeney knowingly used (or more, accurately, abused) his position as director of the Bank to obtain the funds. This behavior clearly rises to the level of defalcation.

*3. Sweeney Acted As a Fiduciary to the Bank at the Time the Debt Was Created:* Because the debtor did not comply with the Bank's loan policy in either the Sweeney Coal loan transaction or the Admiralty overdraft transaction, no formal debtor-creditor relationship between the debtor and the Bank was created. Instead, the debtor used his position as director of the Bank to obtain the Admiralty overdraft for Admiralty and the Sweeney Coal loan for Sweeney Coal in violation of the safeguards built in to the Bank's loan policy for dealing with loans to directors.

The debt Sweeney owes to the Bank is not the debt Sweeney Coal owes the Bank as a result of the Sweeney Coal Loan. Only Sweeney Coal owes that debt. As a director and shareholder of Sweeney Coal, Sweeney is not personally liable for the debts of Sweeney Coal absent a piercing of Sweeney Coal's corporate veil. *Hertz Corp. v. Fraund*, 1988 WL 83403, 1988 U.S.Dist.Lexis 7855 (1988). Instead, Sweeney's debt to the Bank is based on the fiduciary duty he owed to the Bank as a director of the Bank which he breached in causing the Sweeney Coal loan to be made to Sweeney Coal to cover the overdraft in violation of the Bank's loan policy. The Bank was injured by Sweeney's breaches

---

**6.** *See, e.g. Harper v. Rankin*, 141 F. 626 (4th Cir.1905), 200 U.S. 621, 26 S.Ct. 758, 50 L.Ed. 624 (1906) (debt arising from embezzlement of funds by an officer of the bank was incurred in a "fiduciary capacity"); *Hartford Accident & Indemnity Co. v. Flanagan*, 28 F.Supp. 415 (S.D.

Ohio 1939) (bank was fiduciary for purposes of declaring a debt incurred through embezzlement nondischargeable); *In re Wright*, 87 B.R. 1011, 1017–18 (Bankr.D.S.D.1988) (bank officer and director owed a fiduciary duty to the bank within the meaning of § 523(a)(4)).

**540**

of his fiduciary duty because the Sweeney Coal loan proved to be uncollectible.

In that regard the facts now before the court are markedly different from those confronting the court in *Harasymiw v. Selfreliance Federal Credit Union*, 97 B.R. 924 (N.D.Ill.1989). The debtor in *Harasymiw* was a manager and treasurer of the creditor bank. The debtor, who obtained a loan from the Bank in the amount of $150,000, complied with the bank's loan procedures: she submitted a loan application, and she disclosed her assets and liabilities. Also, an independent attorney was retained to determine whether the debtor had supplied the bank with truthful information. A formal debtor-creditor relationship between the debtor and the bank was created and the debtor "was *not* acting in her capacity as ... director, or officer when the debt was [incurred]." *Harasymiw*, 97 B,R. at 927 (emphasis in original); *accord In re Wing*, 96 B.R. 369 (Bankr.M. D.Fla.1989) (express trust not created when director of bank incurred a debt in an ordinary commercial transaction). Unlike the debtors in *Harasymiw* and *Wing*, Sweeney never established a formal debtor-creditor relationship between himself and the bank. In fact, he never personally borrowed money from the bank. Instead, he was acting as the director of the Bank when the debt he owes personally was incurred. His debt is not for money borrowed—it is for breach of his fiduciary duty as a director of the Bank. It is that debt that is nondischargeable under § 523(a)(4).

### CONCLUSION

IT IS THEREFORE ORDERED THAT James Sweeney is liable to the FDIC, as a receiver of the United of America Bank, in the amount of $179,559.67 plus further interest computed from February 9, 1989 to the date of the entry of the order of judgment.

IT IS FURTHER ORDERED THAT this debt is not discharged.